Okay, now I understand that you're splitting time and we're putting each person's time on the clock. Yes, correct. All right, that doesn't mean I'm going to come and take you, make you sit down, it means you should sit down. Yes. All right. We'll make sure to keep our eyes on the clock. Thank you. Good morning, Your Honors. My name is Katherine Kimball Windsor and I represent Appellant Eduardo Hernandez. And this morning, I'm also arguing on behalf of Appellant Leonidas Tirajeda, addressing the claims set out in the joint brief. And as I mentioned, I'll be splitting time with Mr. Lippman, who's arguing on behalf of Javier Perez. Our plan is we're going to split it equally and I'm... And nobody is appearing for the third, for the other defendants. Your Honor, I'm talking on behalf of Mr. Perez, he's not a defendant. Okay, thank you. So I'll take, I'll argue for 10 minutes and try to reserve five minutes for rebuttal. And just to orient us all, this is a case where, that lends itself quite well to being divided because in a way, it's two very separate cases. There's the charges against Mr. Perez, which are quite separate from the charges against my client, Mr. Hernandez, and the two Tirajeda brothers. And if you'll recall, they were charged with the murder of Jose Barajas, Jr. And as you know, the jury did not come to a verdict on those charges and the government elected not to retry them. And our sentence, our clients were sentenced to life terms based on the application of the drug guidelines under the RICO count and the drug conspiracy count. And we raised three major challenges. The big one, of course, was to the life sentence where we particularly concentrated on the reliability of the drug quantity finding. We also raised a short issue at the outset about the sealed documents and as well as a challenge to the dual lay expert testimony that was admitted. So I thought I'd just dive right into the questions that the court gave to us, but I'm certainly happy to answer questions about it. You asked for some guidance as to what you should focus on. They're not exclusive. I so appreciate that. But it was an appropriate request and we're happy to give you some guidance. It really does help the party, so thank you very much. So just to address that first question, which was about the standard under which this court should review the admission of the lay opinion evidence, our contention is that the error was preserved and that the correct standard is abuse of discretion. And I will say, though, that if this court feels that it was not properly preserved, we're also arguing that we meet the plain error standard. Well, I gather, because it was so lengthy, that there were some objections. There weren't. They weren't necessarily on this ground. Well, some of them were on this ground. The way it all played out was that pretrial, the government gave notice that it was going to call this expert witness, Agent Wines, who was going to testify to 10 different topics, including the Mexican mafia, including gang structure, tattoos, interpreting drug jargon. And there was lengthy litigation pretrial, I mean, multiple rounds of motions where the of this testimony. And the district court really indicated that he was going to very much limit this testimony. The way it was left, it's a very... Well, I think we know all that. I don't think it's forthright to comment. I mean, the net result is that there were some objections to some things and many objections, but then many things that were said by the lay witnesses that were not objected to, some of which are now objected to. Is that the short version? That's absolutely true. So when this evidence came in, and we filed this really as a global challenge to these four different law enforcement witnesses, but they're all different. I think... Oh, you filed it as a challenge to the testimony of Agent Wines. I didn't see any indication that you had specifically filed a motion with regard to the witnesses that you're complaining about. You mean now? Now you're... I meant now. Okay. Before this court, we filed it as a global challenge. You're correct, though, in the trial court. I mean, some of these witnesses testified without any objection at all at trial. Well, I mean... At least two of the four by my reading of the testimony. I agree with you with Joe Guadian. He was that very first testimony, and when I read that testimony, I really, I just stopped myself and said, wait a minute. How did I miss this expert testimony? There was so much litigation, and here... The job at the prison is to track the Mexican Mafia, and specifically Mr. Martinez, and look at attempts that are being made, in this case through a fraudulent attorney, to circumvent the prison's rules to prevent illegal communications between inmates and criminal associates outside. So how's that... I mean, he's an investigator. He's not an expert in any testified to what he investigated. Well, his... This type of investigator is who the government calls as expert witnesses, and has called. I mean, it's exact same position. All right, but my question is, how... It's a prejudiced question, which is that all the stuff that went on in the prison with regard to Martinez is pertinent to what these people were convicted of, but it's a little peripheral. Well, so let me get to that prejudice question, because it's a good one. In this case, the government's... The heart of the government's case were these five or six cooperating witnesses, and in many cases, they were the biggest people in the indictment. First, Sergio Pantoja was the lead defendant. He'd been the shot caller of the gang. Then there was his wife, Ingrid Tercero. There was James Villalobos, who was another shot caller in the gang. There was the lawyer, Isaac Guillen. These were big defendants who were looking at huge amounts of time, who carried a lot of baggage. And what Judge Pregerson had said at the beginning of the case was, I don't want to try this case as trial by expert. That was the source of his concern about... I thought the government's theory was that Puppet Martinez was the leader who continued to run the enterprise from the Supermax facility, through the illegal communications facilitated by Guillen. In other words, that's how his orders got delivered to the people on the street. That's correct, and that's what Guillen and... It's not tangential. It's the heart of the government's description of the enterprise. It absolutely is. But the details don't matter very much, that's what I meant by peripheral. The kinds of things that you're objecting to, that the first witness testified to, aside from Martinez's role in the way he ran the enterprise from the prison, really don't matter very much, do they? The details about the Mexican mafia, I would agree with you. That's a huge part of the case, and that was testimony that really needed to be vetted, because it wasn't just lay witness testimony. I agree with you. There was some of that where he authenticated documentary evidence, but he really testified about having reviewed hundreds of letters and... What did he say in that category that mattered to the ultimate outcome of the case? Well, he introduced that... He was the first witness, and he introduced the evidence that then Guillen... They needed Guillen's testimony, as well as Jose De La Aguila, to tie, to explain what had happened from the perspective of the 18th Street. It was that portion of the case. And so what ended up happening was that that expert testimony that Guadian gave ended up Specifically what? That you would say was not lay testimony, specifically, that had something to do with... Well, all of the interpretation... I'm sorry, what? The interpretation of the letters... You mean the fact that he interpreted what the words were? Is that what you're talking about? He interpreted what the words were, that he interpreted the meaning of those letters, that he talked about the tattoos of all these various Mexican mafia members. And that mattered to the theory of the case because... Well, because that was really, as Judge Tallman mentioned, that was a huge part of the government's case was that the Mexican mafia was controlling this gang. And so I certainly think that his testimony, he could have given that lay witness testimony, but when we have expert testimony coming in, what the case law says is that the district court needs to be a gatekeeper to that evidence. And that's what didn't happen here. There was a lot of expert testimony... But I thought that Judge Pregerson had actually limited this testimony when objections were made with regard to Agent Wine. Yes. I mean, I think that Mexican mafia testimony would not have come in, all of that expert testimony, just given what his pretrial ruling was. He expressed grave concern about it and said... But wasn't a lot of this gang tattoos and so on, wasn't it also testified to by these members of the enterprise who were cooperating? Well, that's exactly the point, that it's all this testimony. As Judge Pregerson said, you should call the witnesses who actually have the information and can say, I have this tattoo, this is what it means. And the government did, right? Well, they called these witnesses and what they ended up... The witnesses, as I mentioned, just had huge problems. They were all looking at life sentences. They had huge criminal records. Okay, but that goes to credibility and the jury ruled against you on that by convicting your clients. So we have to assume that the jury credited their testimony. Well, I'm saying that the reason they credited that testimony was because the government called these expert law enforcement witnesses who didn't have those problems, who could corroborate and bolster that evidence. And so by saying that... But how is that different from a narcotics investigation involving Title III wiretaps, where we have some of the cooperating defendants testifying to their role in the enterprise and then the agents helping the jury with coded words and that sort of thing that are overheard on the wiretaps? Well, I mean, if that's done properly, whether it's expert testimony where that code... No, but it often isn't. And I've written about this. I have some issues with it, but we seem to allow that. Our case law permits it. Well, so the case law... I mean, the case law permits some of it. The case law is actually... I think Judge Pregerson sort of had it backwards, but the case law says that it is expert testimony when you're just translating drug jargon, that that is within the purview of expert testimony. It's that the case law... It comes from their familiarity as the investigators who worked on this case for, I don't know, how many years? A long time. Well, that is... And that would be proper lay testimony. But in this case... But we had this, didn't we? It would really help me if you could be specific. Yeah. I mean, discussing this in the air is not helpful. I mean, there are some... And the problem with being specific is that there weren't specific objections, which is why it becomes... Why it all starts to mush together. Right. And I do think, I mean, a lot of the problem is that because this expert witness wasn't vetted, we don't know the source of the hearsay. I mean, I know because the agents admitted on the stand that the basis for some of these opinions was actually hearsay. Give me an opinion. What opinion? Give me one opinion that we're complaining about. Well, let's say, I mean, when he's talking about interpreting the letters, he would say that, you know, I don't know, interpreting... Let's see, interpreting Mayan tattoos. And he would talk about the history of the Mexican mafia and their connection to Mexican culture. And, you know, and how that rests on hearsay. He talked about... And I don't even know because it wasn't vetted. But he talked... In many cases, he gave opinions about... That came from his review of files. So how does that... So let's take the tattoos. How does that hook up again? All right. So it sounds like he was testifying as an expert there or on something he read. Or how would he know this from the investigation? Right. It's not precipient. Right. Then what? Was there something about a tattoo that became a relevant factor in the case? Well, the tattoos were certainly relevant to who was a gang member and to, you know, to who... As to your particular defendants, there was some testimony about their tattoos showed they were gang members? Well, because a lot of the question was, what was in the course of the conspiracy? I mean, in terms of the drug weight, it was... What the drug weight had to do with tattoos. That's what I'm trying to understand. Well, because the question was, what was the scope of the conspiracy and what was reasonably foreseeable? And so... Okay. And did somebody testify that that person who he was supervising was a member of the gang because he had a tattoo? Well, yes. I mean, when they were talking about various drug sales and who had participated in them, that who was a gang member was certainly relevant. And they relied on tattoos for who was a gang member? I mean, that's what... I just don't see how the pieces connect. I mean, what I would say is just that this court has said we... And the Supreme Court has said we need to have gatekeeping when it comes to expert testimony. And part of the problem now is that I'm in a position of saying that, you know, I don't know what the basis of it was because this gatekeeping wasn't happening. I just know that there was this sea of lay testimony and sea of expert testimony. And we don't know. With very little objection by defense counsel at trial to alert the district court that this was even an issue of concern. Well, I would say at the beginning of each of these law enforcement, the FBI special agents, Keenan and Rodriguez and Jenks, there was always a discussion at the beginning where the defense would say, wait a minute, objection. These guys are experts. I mean, for example, I'm just thinking about the Maynard tattoos. I mean, it's perfectly possible the defense counsel said, well, why make an object to that? It doesn't make any difference to anything. Right? Well, I, I mean, I, this evidence was really. Well, but you're talking on gross and I'm trying to talk about specifics and it's not helpful to me to talk on gross. I guess. I mean, I, I don't have a lot of specific examples, partly because there wasn't this gatekeeping and I don't know what was relying on hearsay. I mean, some of, some of the times you can tell. But that's what I'm asking you. I'm asking you what, what was said that was essential. I understand your point about the credibility of the, the former defendants and the former witnesses. And I think it's a good one that, that having cooperation by police officers obviously gave him more weight, but I can't think about it unless I know what we're talking about specifically. Well, let me check. I know. I know your time is out. Go ahead. Go ahead. But also, if I just give you one other example, I mean, Guadian says that he got this file on Martinez, that he read that, that he arrived with a file. We don't know what that file was, but that he read it and that that was the basis for his, or in part, in some way played a part in his testimony about Puppet Martinez and the connection to 18th Street, which was a critical issue. Now, again, because this gatekeeping didn't happen, you know, I don't, we don't, I'm not able to say exactly how that would have, you know, having that gatekeeping where the defense could have said this, you know, that file about Martinez contained all this hearsay and it wasn't reliable because it relied on cooperating witnesses. But then didn't the lawyer testify about the orders that he received from Martinez? And then, in turn, he put money in his inmate trust account, which was his cut from the weekly sale.  And that, and Guadian then testified, and so the, what I'm arguing is that... And there were documents that substantiated all that. So that's how... I mean, I don't know about, I'm not sure about documents, but he certainly testified. I mean, actually, I don't think there were a lot of documents, but he testified about, that he was collecting money. He would receive money. I thought there were documents showing what was actually put into the... Money orders and that sort of thing. Okay. Well, right. Through the, I mean, I think that Guadian introduced some of the, the money that was put on... And there were a lot of kites that substantiated a lot of this. I mean, internal communications from the prison, in the prison. That was something that Guadian introduced. Right. Right. Yes. All right. Thank you. And I didn't get to that last, the second question. I'm sorry about that. It's okay. We have lots of briefing to help us through. Thank you. Good morning, your honors. I am Lawrence Lipman. I represent Defendant Javier Perez. I want to first make a note of a couple of erratas in the brief that I noticed in terms of dates. Of what? I'm sorry. Erratas. Erratas of a date. And it's quite important because it relates to the timeline of, of, of Tricky's. I believe if you looked at the, at the EORs, you would see the error, but the first error is on page 23 of the opening brief that the date says that it was July 20th, but in fact it was September 20th when Tricky met, when Pantoja met in, in Mexico. Likewise in the page 25. Met Perez in Mexico? Correct. Yeah. And I think it said July, which made no sense. Ah. Okay. So perhaps. The baby was murdered on September 15th? Correct. And then the attempted murder of Macedo was on September 21? Yes. And, and I, I had indicated in the brief that it was a July meeting. All right, all right. Don't spend too much time on this. Please. Anyways. So the, the purpose of notice, notifying that is because it's the position of the defense that the conspiracy took place on that date in Mexico, not in the United States. So the first argument. Now, let, let me ask you about that. Does it matter whether Perez was part of the, knew of the object of the conspiracy in California or just whether there was a conspiracy? In other words, if Murillo and whoever the other person was, were agreed in, in California that Macedo was going to be murdered, but didn't tell Perez, just told Perez that they were going to take him there and it wasn't until he got there that Perez was told him, we're going to murder him and you're going to do it and stuff. Does that matter for you, for purpose of the argument? That is, is it sufficient that the agreement, that there be an agreement in California, even if Perez wasn't part of it, or is it your argument that Perez had to be part of it? Well, it's both. Perez had to be part of that conspiracy. He, when he went to Mexico. Well, he eventually was part of it. And there's case law about how, you know, if you join late, you're still bound by whatever the agreement is. So I'm trying to understand whether it's critical to what is essentially an extraterritoriality  There was no evidence that suggested that Perez knew of the agreement. I understand. I mean, that's your strongest argument, if it matters. I'm trying to find out if it matters, because the argument that Murillo and, what's the other person's name? Turki or Pantoja. Murillo was face and Turki is Pantoja. Okay, Turki. Whether they, there's certainly evidence that they agreed in California. You think it's bad evidence because you think Turki is a liar, but there's evidence. There's a lot, to get Perez into it in California is completely inferential. The question is, does that matter is what I'm asking you? Well, what happened? Does that legally matter as a matter of law? I would submit it does, because he has joined the conspiracy in Mexico and has become, when he did agree to do the murder, which. Well, he joined a conspiracy in, well, argue. I mean, at least there's more evidence that he joined a conspiracy to kidnap in California. Yes. Although the question then becomes the kidnapping for what, what knowledge. It was a kidnapping because he agreed to go along with them for whatever purposes it was. He wasn't part of it. I mean, he had to have some reason to go to Mexico, didn't he? The reason that he believed was that to take Rusty, who was the Macedo to hide out in Mexico because of the heat that was on him. So that's why he. But why would they need Perez for that if they've already taken Macedo to Tijuana? The first was to, to obtain the vehicle because it was Perez that originally called to get the vehicle from, from. Right. And that occurred in the central district of California. Right. And so the jury could have found that that was the first overt act in furtherance of the conspiracy. Of the, which conspiracy of the kidnapping. Are you arguing now about one of the questions we asked you? Which question are you asking? Yes. The first question relates to the, you would ask. Question two. But I think what we really had in mind was the question of, aside from where the conspiracy was, where the murder was, with regard to the RJR standard. You asked if I waived the, you asked if I waived the objection to the kidnapping. And the answer is yes, because he was found guilty of a conspiracy to kidnap in California. The argument on that relates only to sufficiency and not with respect to the error in extraterritorial application. With respect to the conspiracy to murder and the attempted murder, it's very important in terms of jurisdiction where that event occurs because it's admitted under the Nabisco case that that application of that statute does not apply unless the crime occurred in. The question in my mind is how much that crime has to occur. There's some suggestion. I mean, you've got two different crimes here. You've got the conspiracy and then you've got the actual attempted murder. And I think they need to be treated differently. As Judge Berzon was suggesting, perhaps once you join the conspiracy, you're, you know, we'll have to figure this out, but you may be bound by all events of that conspiracy. There seems to be some evidence that some of that conspiracy may have happened in California. What about the attempted murder itself? None of that conspiracy or none of that charge happened in California. The whole, the attempted murder occurs when he makes the attempt and strangles him. Well, that's my question is, are there predicate acts that may have occurred in California? I mean, do you look, well, first of all, the conspiracy, I don't agree with you. I think conspiracy is different. It's not just when it happens. But for attempted murder, is it only when they approach him and try and actually kill him? That is the submission. Well, but my question, there's some case law in California that suggests that if you have a predicate act, a non-de minimis predicate act that occurs in California, that that can count. So, for example, if they bought the rope, if they planned this out in California and then went down, why wouldn't that be a predicate act to the attempted murder that could give a hook to jurisdiction in California? That is possible if there was evidence of that. Okay, and you're telling me there's no evidence. There's zero evidence. We just don't have any evidence of where the rope was bought. What about just deciding to kill? Take the conspiracy out of it, but what about if there were evidence, and maybe there is none, that Perez knew in California he was going down to either murder or, in this case, attempted murder, would that be enough of a predicate act separate from the conspiracy? I would submit no, because under the elements of the chart, it is when the actual event takes place. Well, that depends on the chart. For RICO, we know that it's the predicate act. What about for conspiracy? I'm speaking specifically of the conspiracy or of the actual attempted murder in County 18. County 18 was the attempted murder, which I would submit clearly violates the Nabisco case. Was that instruction given with regard to County 18, the one about nothing has to happen in California? Yes, it was, and that was instruction number 52, which is the EOR 44. It says, all the RICO-VICAR statutes apply extraterritorial. It is therefore not necessary for the government to prove with respect to Counts 1, 11, 16, 17, 18, and 19, and 18 is included in there, that any part of the crime charge took place in those states. Well, that's just false, and that's why it's in the face of the court instructions number 53, which says that there must be an overt act in California. But then, I guess that's the ambiguity in the instructions, right? That's the inconsistency? Yes. Because on the very next instruction, which is more specific with regard to VICAR conspiracy, the jury is told that they have to find an overt act committed in the state, which the evidence suggests could have been obtaining the car and un-veigling the victim to get into the car to drive them. There is argument that the government made and could have been in the jury discussions. Well, yes, he did do this, so we don't know what the jury decided when it decided guilty, because someone could have said, well, no, wait a minute, it doesn't matter where it happened, because this says it doesn't matter where it happened. But this is more specific, and it follows after the erroneous. Does that make a difference? It falls after the what? After the erroneous instruction in 52. In other words, the jury was told specifically with regard to VICAR conspiracy, you must find by proof beyond a reasonable doubt, fourth, an overt act was committed in the state by one or more of the persons. So it doesn't have to be committed by Perez. Right, but it has to be a part of it in the state. But 53 only covers conspiracy, is that correct? Conspiracy to murder. And is there a separate jury instruction that would cover attempted murder? Yes, that was the instruction for 56. It wasn't attempted murder as such, it was the VICAR claim, right? It was the VICAR attempted murder. That's why you were confusing me. It was the VICAR attempted murder. But is there a separate correctional instruction for VICAR attempted murder, as there is with VICAR conspiracy? No, it just was specific to the RICO. And so the jury in the jury room, all 12 of them are just trying to figure out where this happened, and someone says it all happened in Mexico. And someone says, no, part of it happened in California, so we have to convict. On the other hand, they say, no, wait a minute, instruction 52 says it doesn't matter where it happened, so therefore he's guilty. And so it was the error in the instructions where it should have been. If they didn't have this instruction 52, we might not be here. So you're not challenging count 16, but you are challenging count 18, is that correct? No, 16 is being challenged as well, because we're saying that the Nabisco case states that that count is... I didn't read that in your brief, that you were challenging count 16. I think it was 17 that you're referring to, the kidnapping. No, I think it was... And so you're not challenging that? We should just take it off the table? We're not challenging the error. Well, there was an error, but it was a harmless error, because he was convicted of the kidnapping conspiracy. So the jury didn't find that the kidnapping conspiracy elements took place in California, and therefore we can't argue about the bicar conspiracy. Well, but the conspiracy could have taken part in California, and not the kidnapping. The conspiracy to kidnap was count 17. So anyway, the point is that, and I see my time is almost up, the point is that that error caused the jury confusion, and we don't know if there was unanimity of the finding that the act took place in California, which is where the... And the conspiracy as to whether or not there was a... He was guilty of a conspiracy to murder in California. Yes, correct. Those are the two things. You're not talking about the conspiracy to kidnap, and you're not talking about the... I guess you are talking about the first RICO claim as well, count one. Yes, count one, because those predicate acts are the ones that are in the... In order to support count one RICO, they would have to prove the predicate acts, which were 16 and 19. But he can be convicted in count one of RICO conspiracy if the jury finds the narcotics. That's possible, but there was absolutely no evidence in this case that related to his involvement. But he doesn't have to have engaged in two predicate acts. Other co-conspirators can engage in predicate acts, can they not? Well, he would have to have... It just has to show that he joined the conspiracy and willfully became a member of it. Correct, but he never joined... There's no evidence that he joined the RICO conspiracy and all the drug operations of the 18th Street gang, other than at the time when he came in the picture. And therefore, in terms of being responsible for RICO, he would have to have agreed and entered into an agreement for specifically those predicate acts. In other words, if you join a RICO conspiracy, a gang today, you're not responsible for everything that the gang is doing or has done, just because you became a member of it. Under the Pinkerton theory? I'm not sure that's a correct statement of the law. In other words, as I understand it, the government's theory was that this was an illegal enterprise of individuals associated, in fact, who were members of the CLCS gang, and the enterprise carried out its affairs through a pattern of racketeering activity, which included drug dealing, collecting rents, murdering people, protection, kidnapping people, all these things that were charged in the rest of the indictment. So if the jury finds that he joined an ongoing RICO conspiracy, and that these acts were reasonably foreseeable, isn't he guilty? But there's... Isn't he guilty whether he commits any predicate acts? There's a test in Pinkerton, and it's reasonably foreseeable. There's no evidence that he would meet the Pinkerton test when he joins and even knows what the gang does, or takes any part in the activity. But if the jury believed the government's theory that the murder of Macedo was essentially in order to maintain discipline within the ranks... Yes. That's... Right? Yes. And the original attempt to murder the street vendor, which resulted in the tragic slaying of the baby, was essentially to maintain enterprise operations on the street corners and so on, and controlling collection of... Yes, but there would have to be evidence that when he joined the gang, or joined the enterprise, not the gang, but joined the enterprise, that it was reasonably foreseeable that this activity would be committed. That activity had already been committed when he joined the conspiracy. I guess the problem I'm having is on the basis of the overwhelming evidence of the enterprise's activities. It's not a hard stretch for me to say that a reasonable jury could come to that conclusion, that Perez knew darn well what he was getting into when he went along on the ride to Mexico. Well, he wasn't getting into the drugs that had been sold before, or the killing that had happened before. It wasn't reasonable to foresee... But this was part and parcel of the way the enterprise did business, through fear and intimidation. Again, those are all facts. Those are all crimes that occurred before he... Those are the enterprise, but you need a predicate act, a conspiracy. The predicate act of the conspiracy that relates to him... Your time is up. I'll give you one of you, whoever decides to take it, a couple of minutes to rebuttal. Thank you. Good morning, Your Honors. Julia Reese of the United States, and I'd like to join my colleagues on the other side in thanking you for the guidance before argument. I'll try to go through and hopefully reach all four of the questions that the Court posed. I'm going to start with the lay and expert testimony issue that was raised in the joint opening brief. And starting with the standard by which this Court should review that issue, it's not enough that they engaged in pretrial litigation about Agent Wines' testimony. It's not enough because there was no pretrial ruling at all, much less a pretrial ruling that would cover other witnesses' testimony. They had an obligation, while these other witnesses were testifying, to object if they thought that there was something problematic about the testimony that was being rendered. And they didn't really do that. There were some isolated and sporadic objections, but they didn't really address the opinion issue that they're raising now on appeal. I believe there's only one objection that even references opinion testimony, and that was Defendant Perez's counsel's objection in J.E.R., the Joint Excessive Records 157-61, about, I believe it was Detective Jenks' testimony. And even in that particular objection, Mr. Perez's counsel said that he had no problem with that witness simply defining terms. And so that's beyond just waiver. That's an express disavowal of any objection to jargon testimony. And again, that's at the Joint Excessive Records 157-61. So what was the objection to? It was to interpretation of one of the phone calls, I believe. And I can get it precisely for the court, but it was an objection to interpreting a particular term, a particular phrase, that was used by individuals that were engaging in a conversation with one another. But, again, even there, what he said is, I don't have any problem with him simply defining terms. What I have a problem with is talking further about the context in this particular investigation in which those terms arise. And so, again, here to the extent that their argument on appeal is, I've got a problem with this discussion of jargon, they disavowed that issue in the district court. Oh, one person did. I'm sorry, Your Honor? One defendant did. Yes. But that certainly would have brought it to everyone else's attention and would have brought the issue to the floor and said, look, if you have a problem with this, you do need to raise it with the court. And they didn't. And that's why the government's position is that plain error review applies here. Let's go forward. Let's assume that. And so the only issues that counsel has identified as being problematic, at least in argument today, were the interpretation of jargon and discussion about tattoos. And I want to focus on just tattoos. So I understand what you're saying was the whole history of the Mexican Mafia, which he couldn't have known directly, and also the reading of Martinez's file, which was hearsay that he was testifying to. So focusing on investigative audience testimony, I do think that much more of that is recipient witness testimony than my colleague is accurately representing. He personally observed these individuals in the prison interacting with each other every single day. He personally saw their tattoos. And, you know, I'm wearing a suit. I wear a suit almost every single day, at least when I'm coming to court. And so if you saw me going into the U.S. Attorney's Office every single day, wearing a suit, flashing my badge when I go in, you probably would reach the conclusion that I'm an assistant United States attorney and that I'm employed in that particular office. If you, similarly, in prison, saw individuals talking with each other, intercepted their communications, saw that they all happened to have the same kinds of tattoos, you might reach the conclusion that those individuals are associated with each other and that those tattoos are indicia of their membership and association with one another. I wouldn't know the history of Mayan tattoos unless you read it somewhere. No, I don't think that you would know the history, but you would be able to draw the conclusion that perhaps those Mayan tattoos are associated with Mexican identity. Well, they're tattoos. When they're Mayan tattoos, you have to read in a book. Yes, that they are. I mean, I think that you might be able to draw the conclusion that they appear to be some sort of indigenous symbolism or symbols. But, yes, I think to know precisely that they are Mayan tattoos, you would have to have some external knowledge about that. Now, that isolated issue I don't think would be enough. What about the history of the Mexican mafia? Did he testify to that? He testified primarily about the structure of the Mexican mafia. How did he know that? By his observations in the court, or in prison. And I do think that that is where his particular focus was on how Puppet Martinez was running this particular clique and running this particular thing. Did he testify more broadly to his connection to the Mexican mafia and how the Mexicans I mean, I guess one of the important things here was this notion that there were certain things that you had to do with the Mexican mafia. Like if you killed a child, that person had to be killed. And was that part of his testimony? I don't know. I don't right now recall Investigator Guadian testifying to that effect. There were, of course, a number of other witnesses that testified to that effect. I don't recall if I think that came from the lawyer and also from maybe Hernandez. Yes, I do. I mean, that certainly came from various cooperating witnesses. And of course, they, being members of the enterprise, would know what the enterprise's rules are. This is a prison gang, correct? The Mexican mafia was formed inside prisons. This is not a street gang. Yes, it's a prison gang with kind of oversight over street gangs on the outside. And so those street gangs have allegiances to the Mexican mafia. And this is a guy who investigates a prison gang. That's his job. Yes. And he does that day in and day out. And at this time period, he wasn't just investigating prison gangs in general. He was investigating this prison gang, this prison gang under the leadership of Mr. Martinez. And given that personal and direct involvement in the investigation of this particular prison gang, I think much more of the information he was rendering during trial is actually properly characterized as precipiate witness testimony. Did he testify to Mr. Martinez's, what was Mr. Martinez's file that he read? He did testify that he read that file. I don't really believe that he actually relayed any information from that file. I think the purpose of the testimony about Mr. Martinez's file was primarily, and I could be wrong about this, but I believe that it was primarily to just say that it alerted him to the fact that this was an individual of particular interest who, when I'm investigating the Mexican mafia, I need to look at this guy because I need to consider him as a member of the Mexican mafia. And that background from his file was confirmed by investigator Guadian's direct observations, again, on a daily basis in the prison, and his interception of many, many, many of Mr. Martinez's written and oral communications. And the other, so I think that the Guadian testimony is, I think, the primary issue that has been raised for an argument. The tattoos, again, I think that the tattoos can be recipient witness testimony, and to the extent, I mean, it's hard to, they can't identify any particular prejudice from the tattoo testimony, I think because it really wasn't contested. Much of the testimony about the tattoos is that the Roman numerals XVIII is associated with 18th Street. I don't know that there's really any meaningful dispute that can be raised that XVIII translates into 18. As I understand the structure, that is an offshoot outside the prison of the Mexican mafia? Yes, that's a street gang that has an allegiance to the Mexican mafia. So basically, if any individual who's a member of 18th Street goes into prison, they are under the umbrella of the Mexican mafia. And then CLCS is some sort of an offshoot or click within the 18th Street? Yes, so there's multiple different clicks that are within the 18th Street gang. So it's kind of, you know, you've got little, tinier clubs that kind of go up to this grand council. And who testified to all of that, the structure? I believe primarily cooperating witnesses explained how that structure worked. I do think that there was some testimony, and I'd have to go back through precisely about what the exact testimony was about this structure with these outside street gangs. I do think that there were some witnesses, some of these law enforcement witnesses who may have testified to that relationship. What was the RICO Enterprise? Was it the Mexican mafia in general, or one of these subgroups? I'm sorry, I didn't hear the first part of your question. What was the RICO Enterprise? Was it Mexican mafia in general, or one of these subgroups? It was the 18th Street gang, and I think with a particular focus on the Columbia Little Psycho. So it was the street gang outside of the prison context. And just on this issue, I think they haven't identified any particular statement that is particularly problematic. I think that goes to the harmlessness of any error here. There was overwhelming evidence from cooperator after cooperator after cooperator about the interpretation of jargon, about the graffiti, about tattoos, and about the structure of the gang. And I understand that they've contested now the credibility of those witnesses, but in the district court they really didn't dispute the existence of the enterprise. They didn't dispute its structure. They didn't dispute what these tattoos meant. They didn't dispute what this graffiti meant. What they primarily raised in the district court was their particular involvement with this enterprise. And so to the extent that there is any error with admitting any isolated portions of the testimony, that error was harmless. Are you going to turn now to the Vicar claims? Yes, and I don't have any further questions about that issue. On Judge Tolman, I do, on the count 16 and count 18 issue, whether Mr. Perez has waived count 16, he certainly has waived count 17 by failing to raise it in his opening brief. The count 16, unfortunately, as much as I would like to say he's waived that as well, he actually does address it in his opening brief. It starts at page 16 is where his argument on count 16 starts. So, again, as much as I would appreciate a waiver there, he actually did preserve that issue. Now, on the merits, I just don't think that here we have an issue. I didn't understand your brief on the merits of this question at all, given RGR Nabisco. It seems that you've got a major problem with regard to the Predican Act for the recall claims and probably for the Vicar claims. And you were writing around it entirely in footnotes. I don't understand why there isn't a big problem with the instruction because of where the Predican Act of the murder took place. So, I want to make two points on that, Your Honor. First, yes, we do concede that that general instruction is inconsistent, particularly with the individual instruction. You didn't concede it in your briefs at all. I believe that you kept writing that because I just couldn't understand what you were saying. Okay. So, let me see if I can break it down here a little bit better. So, I'll start first with the question, which I think the brief did address a little bit, and perhaps not as clearly as it could have, is this question of whether the locus of the offense is actually an element that has to be proven to the jury beyond a reasonable doubt. And in that argument, I think it's important to understand what exactly it is that is the element of the recall and vicar offense that is contested here. And the element is, was there a Predican Act that did the defendant commit a crime of violence that was charged in a particular count? And the jury received instructions about that Predican crime of violence that is identified in a particular count. And those instructions map on, or they're supposed to map on, to what the elements are that the government or the state would have to prove if they proceeded to trial on that Predican Act. And so, here, the Predican Act, with respect to Count 16, is conspiracy to commit murder. In California Penal Code, Section 182 requires that the state allege and prove at least one act, but there's no actual reference in the underlying statute under California law that would impose upon the government a burden to prove that there was an overt act, particularly in California. Well, but wouldn't that be, I mean, for there to be jurisdiction, there has to be some act that occurs in California. Otherwise, you're applying it wholly territorially, aren't you? Extra-territorially. Yes, in order for California, basically, to have the power to legislate and the power to reach this particular conduct, there does have to be some overt act in the state of California. So, what I'm interested in is what happened in California, because, I mean, that seems to be the big question. And what is, maybe you could walk through that, maybe you're going to, but what is the actual evidence that the jury heard about acts that happened in California? Obviously, the attempted murder happened in Mexico, but what happened in California? Well, because the attempted murder occurred in Mexico, if you agree with that, then with regard to, I think it's County 18, there's prejudicial error, period, the end, no? So, no, and the reason for that is because under California law, there can be sufficient, you can have a series of predicate acts that pre-date the actus reus that can still give California jurisdiction under its long-arm statute. All right, what's here? So, here, I think Perez made a phone call to make sure they had the car in order to, or to try to get the car in order to transport Mr. Macedo, to kidnap Mr. Macedo, and transport him to Mexico in order for him to be murdered. I think that's a predicate act that occurred in the United States. But there's some predicate act provision in California with regard to where a murder occurs? So, in... Predicate act's confusing because predicate act applies to RICO. You're not talking about that. You're talking about something else. Yeah, I'm talking about overt acts that are in furtherance of the ultimate act, the ultimate crime that is committed. And this is again... But the overt act concept comes, I mean, predicate acts has to do with RICO. Overt acts has to do with conspiracy. Here, the predicate act was attempted murder, not conspiracy for attempted murder, right? As to RICO. Yes, as to the RICO count 18. And the 18, count 18. Count 18, yes. So, does that mean that if count 18 goes out, then the RICO claim also has to go out? I don't believe so, because I believe that the kidnapping was also identified as a predicate to RICO. I'd have to check that. But you need two. So, I would have to check how the indictment was structured. So, I'm not sure if... And I can submit a letter if the court would like on that particular issue. So, your position with regard... So, there are two different things I want to hear about. One is the attempted murder, and the other is the conspiracy for murder, which I guess is relevant to, what, count 16? Is that what it's relevant to? The conspiracy? Yes. So, starting with just the attempted murder. Your argument is that under California law, they could prosecute what happened here in Mexico if a phone call was made in California. Yes, absolutely. And I think that... Because that was a predicate... Sorry, I'm saying predicate. Maybe preparatory is a better way to say it. Yes. There was a preparatory act to the attempted murder with setting up and establishing the vehicle to take him down to Mexico. Yes, and the kidnapping itself also was a preparatory act to the attempted murder. And that happened in California as well. Yes, and in fact, we have, with respect to that issue, we have a jury finding that all of the acts involved in the commission of the conspiracy to kidnap were in the United States. And that's because the jury made that particular finding with respect to count 20, pursuant to instruction number 59. So, we have a jury finding that all of the acts associated with the kidnapping conspiracy occurred in the United States. And so, I think that the clearest California case that makes it very, quite clear that California could have exercised jurisdiction over the attempted murder, even though the actual actus reus happened in Mexico, is Brown. And that's a case in which the doctor transported, came to the United States, transported his patient to Mexico, did a botched surgery in Mexico, and then brought him back. And that's essentially the same kind of conduct here. The problem you have in Brown is that he didn't die until he was brought back. So, he died in California. And so, that was my question about Brown, is you plan to go down and amputate his leg, apparently illegally, and you go down to Mexico and do that. If he had died in Mexico, would Brown have turned out differently? I don't think so, because Brown really focuses on what are the acts that you do within the state. Have you done any act that is a preparatory act for the ultimate crime that is subject to... Well, and Brown says it has to be a non-de minimis preparatory act done in the state with intent of completing the crime. And so, it seems to me that you're right, that kidnapping is a non-de minimis act with intent to commit the crime. Absolutely. And maybe that's enough. Is that the same as the conspiracy happened before they got the car, I guess? When did they enter the conspiracy? So, the conspiracy to kidnap... I think they entered... Certainly, Murillo and Pantoja reached an agreement well before the phone call to set up the ride to Mexico. That leads to my other question, which is, with regards to whether any part of the conspiracy occurred in California, does Perez have to be part of the conspiracy that occurred in California, the conspiracy to murder, or is it enough that Murillo and Pantoja had a conspiracy? It's enough that Murillo and Pantoja had a conspiracy. Why? Because it's a bedrock principle of conspiracy law that you're responsible for the actions of your co-conspirators. Before you've joined the conspiracy? Yes. You are responsible for the prior acts of your co-conspirators. If they're foreseeable, right? Yes, if they're foreseeable. And certainly, at the point that he... But the prior acts that you're responsible for are over at X. This is the conspiracy itself. There's a confusion that often goes on with regard to a Pinkerton problem. This is not a Pinkerton problem. This is the conspiracy itself, not the over at X in pursuit of the conspiracy. So the question is, is he responsible for the conspiracy before he joined it? So I think this is really just a question of, can California exercise territorial jurisdiction over you? No, but I'm asking you a question. Yeah, that depends on a substantive question, which is, is he responsible for the conspiracy before he joins the conspiracy? Not for the over at X of the conspiracy, but for there being a conspiracy. Yes, I believe California could exercise jurisdiction over that because some part of the conspiracy took place in California. But I think the question is, setting aside the extraterritoriality, and I think we've heard your argument on that, are you liable when you join a conspiracy? I think the answer is yes. When you join a conspiracy at any point, are you liable for what has happened before? Like, if there's a conspiracy to commit murder and then you join the conspiracy by helping arrange a car for it, are you liable for the whole conspiracy? I think the answer is yes, unless... If you know. Yeah. If you understand that there's a conspiracy to attempt murder. But what if you don't? What if you think it's a conspiracy to kidnap a person and take them to Tijuana where he will live happily ever after? Are you responsible? Have you committed the crime of conspiracy in California? That's what I'm trying to find out. So certainly there is a moment that Mr. Perez realized... That's a different question. That's a factual question. I'm asking you a legal question. Let's suppose he didn't, and there's no reason to think he did. If he never realized what the purpose of the agreement was, then I don't think he could be liable for a conspiracy to commit murder. If he never... Never. Not until he got to Mexico. And then I think he would be responsible for the prior acts and the prior agreement that was made. But I guess isn't that part of the question? When he arranged to get the car, did he have to have in his mind, Okay, we're doing this so we can go down and kill him or attempt to kill him. Does the government have to prove that that thought was in his mind in California? Or is it enough that that thought came into his mind somewhere in Mexico and then it traces back? I'm willing to accept that there was sufficient evidence that the other two entered into a conspiracy in California. So I have two answers to that question. One is, I do think that it is sufficient that he entered the agreement at some point in time. I don't think he had to know at the moment that he placed that phone call that they were ultimately taking him to Mexico for the purpose of murdering him. I do think the evidence is quite clear that he did know that at that point. Tell me what it is. So I think to answer that question, I think we should focus on what the jury necessarily found. And you can look to the other elements of the other crimes. The jury necessarily found that Mr. Perez agreed to kidnap Mr. Macedo. I'm not sure why you would need to kidnap Mr. Macedo in order to keep him safe and protect him from harm. Well, but it could have been just to get him out. Actually, it could have been. It could have been, hey, there's a price on his head. Let's get him out of here. It's bad for business. It's bad for everybody. We just got to get him out of here. It could have been that. So the other element I think that really quashes any argument on that is that the jury found the purpose of Mr. Perez's participation in the attempted murder and the purpose of his participation in the kidnapping conspiracy was to further his own position in the gang. And the evidence that there was in this case is that you increase your position in the gang not by doing good deeds. You increase your position in the gang by… It wasn't a good deed. It wasn't a good deed. They were kidnapping him. I mean, let's put it this way. The evidence is flimsy. So if there was an erroneous instruction, it would be hard to call it harmless. In other words, it's not a sufficiency question as such. It's a question of whether if there was an erroneous instruction, it was a harmless erroneous instruction. So do you want to address it that way? Sure. Just turning back to this again, on this issue, it is plain error review. On count 18, we certainly do have a problem because we don't have the same kind of curative instruction that we have with instruction number 53 with respect to count 16. So there's a problem there that is distinct from… Does that make it constitutional error such that we have to find beyond a reasonable doubt, or is it a different standard of review? I think it would be constitutional error to the extent that it was an element that the jury would have to find. And that's, I think, where the underlying California law really comes into play. And California law, as set forth in Beth, is that the territorial jurisdiction question is not an element that the jury has to decide and certainly not something that the defendant has a right to a finding beyond a reasonable doubt. And here, I think, that's where the plain error standard really comes in. How can that be? I don't understand. It's not a territorial jurisdiction question. It's a fact. Where does this happen? Yes, and under California law, that's a fact that can be found by the judge, by a preponderance of the evidence. It's not an element that the state has to prove beyond a reasonable doubt. And so I think here, it's not clear or obvious that Mr. Perez had a right to a jury finding at all on this question of locus. And because we're in plain error review, because it's not clear or obvious, given the state of California law that he had a right to a jury finding on the locus of the crime, it can't be plain error. And then even if we assume that this locus of the crime is an element that Mr. Perez would have been entitled to a jury finding on, I do think viewing the instructions as a whole, at least with respect to count 16, the issue with the general instruction was cured by the specific instruction. So you have instruction number- We're on count 18. You keep jumping around in a way that I find very confusing. We're not talking about count 16. We're talking about count 18. So I agree that we have a problem with count 16 because we don't have the curative instructions. Count 18. Sorry, yes. And your arguments about that problem, as I understand it, are, one, he wasn't entitled to an instruction. He wasn't entitled to a jury finding in this anyway. And two, under California law, the fact that the murder actually occurred in Mexico isn't the end of the story. There still could have been California jurisdiction. In other words, the instruction was partly true. It wasn't entirely true, but it was partly true. Yes. Yes, Your Honor. And I think the primary argument on the merit is that he wasn't actually entitled to a jury finding on this locus issue at all. I think the question of the preparatory act being sufficient really goes to the harmlessness of the error with respect to count 18. So is it, outside of the conspiracy, don't we have to, if we're going to uphold count 18, if there's any way to do it, don't we have to take facts that were found by the jury with respect to count 16 in the conspiracy and carry them over to attempted murder? Because otherwise I don't see how we could cure that. Yes, I think you'd look to count 16, but you also, I think, would look to the facts found with respect to count 20. And I'm saying that because that is, count 20 is the substantive conspiracy to kidnap conviction, and with respect to that count, which was not the subject of the general count about extraterritoriality, or the subject of the general instruction about extraterritoriality, that, for that count, the jury received an instruction that all of the acts involved in the commission of the conspiracy to kidnap had to have been found in the, or committed in the United States. And so you have the entirety, factual finds by the jury that the entirety of the kidnapping took place in the United States. Okay, so the conspiracy to kidnap or the conspiracy to commit murder, any of those facts that were found, if they could be a non-de minimis preparatory act for murder or attempted murder, we could theoretically uphold count 18. Is that the government's position here? Okay. And those acts would be the borrowing of the car used to transport the victim, and tricking the victim to get into the car, thinking that he was going to Tijuana for safety. Yes. Okay. Unless there are additional questions on extraterritoriality, I'll try quickly to address one or two of the other questions. Yeah, look, I'm actually interested on the firearms. And primarily I'm interested, I'll just put it out there, I think it was erroneous. Our case law seems to suggest that the police have to have found a firearm. My bigger question is, is it harmless? And I mean, feel free to rebut me on my first presumption, but it seems like your strongest argument here is that it was harmless and would not affect the sentencing, because regardless, he would have had a minimum of a life sentence. Is that right? So I would like to first rebut you on your first point. The testimony here was that the gang members regularly availed themselves of communal gang guns for the purpose of protecting the distribution hubs and also engaging in shootouts in territory with rival gangs. And I'm going to draw the court's attention particularly to GER 656 to 57 and GER 2123. That's where two co-conspirators describe the shot-callers' responsibility to make these kinds of communal guns available and describe the gang's general propensity to have these communal guns hidden around so that they could be used in order to defend the individuals who were selling at distribution hubs. Was this not a personal use of a firearm? I'm sorry? Enhancement. Does there have to be a personal use of a firearm? Personal possession of a firearm. No, you can be held responsible for a co-conspirator's possession so long as it's reasonably foreseeable to you and in furtherance of the jointly undertaking criminal activity. And here at GER 1965 to 1966, Detective Trejo testifies that he saw Leonard Iruheita conceal a gun around one of the Burlington hubs and then he recovered that firearm. So there actually is testimony, again, at GER 1955 to 1966. But he didn't see him having a firearm. Yes, he did see Mr. Iruheita. He saw Mr. Iruheita with a firearm. He saw Mr. Iruheita concealed a firearm in sort of the hub of a wheel of a car, and that's entirely consistent with the multiple cooperating witnesses who testified that they regularly kept guns concealed around the distribution hubs for the purpose of protecting the individuals who were selling drugs at the distribution hubs. And, sorry, Iruheita, is that? There were two brothers. Yes. Which Iruheita? Sorry, Leonidas. Okay. And, again, that's at 1965 to 1966. So, yes, there was a firearm that was recovered, and it was recovered in circumstances that were entirely consistent with the multiple cooperating witnesses who testified that the firearms were kind of made available as a general matter. But even if that personal recovery wasn't sufficient, a case that I think is on point with respect to this issue, and it's out of the First Circuit, so it's persuasive, not binding, is United States vs. Burgos v. Figueroa. Let's go back. You're telling me that Hernandez and Leonidas did not need to themselves have a firearm. A firearm could be in furtherance of the drug trafficking conspiracy, but don't they have to have a firearm? No, they don't personally have to possess it. The guidelines make clear that you can be responsible for a co-conspirator's possession as long as it's reasonably foreseeable to you and in furtherance of your jointly undertaking criminal activity. Mr. Hernandez was overseeing this entire hub. There was testimony that both of the Iroheda brothers would post up at distribution hubs with guns to protect them. So your point is the gun actually lends itself to the enhancement for both Hernandez and Leonidas. Yes, that it would lend itself to the enhancement for all of them. But Leonidas is the only one who was actually seen with the gun, right? Leonidas is the only one where there was an actual law enforcement officer who recovered a firearm. But he's not the only individual who was ever identified as having ever possessed a firearm. At GER 1232, Mr. Pantoja testifies that he saw Vladimir Iroheda posted up at a distribution hub with guns to protect the hub. At GER 1240 to 1243, Mr. Pantoja also testifies about the use of guns to defend territory and workers from rival gangs, and he specifically identifies Vladimir Iroheda and Mr. Hernandez as having been in possession of firearms in that particular instance that he's describing. So all three of the defendants who received the firearms enhancement, there was testimony that they did use personally firearms. But there was one law enforcement officer who testified explicitly to recovering one. You're telling me it doesn't matter whether they personally used a firearm. Yes, it doesn't matter. But, in fact, here, even if it did matter, there is evidence that all three of them personally possessed firearms in furtherance of the conspiracy as well. Can I just follow up? Say we don't buy that argument. Can we just say this is harmless? I'm looking for a way out of here. I mean, these guys are going, you know, they're in for life. Does it really matter, or is this something we would really have to send back for sentencing? The court did say that it didn't matter. But you think we might actually have to send it back for sentencing. I think it is hard for me to say that what's here is an argument that there's a guidelines calculation error. But isn't it true that even if you struck the enhancement, you'd still end up with a guideline range that justified life imprisonment? Yes, absolutely. And the judge said that he would impose a life imprisonment sentence. I do think that under these circumstances, maybe in the kind of narrow category of cases in which you could say that even the guidelines calculation error is harmless because the range is still the same. Is the range the same, or did both of them include life sentences? There's a difference between the recommended sentence is life or the recommended sentence is 300 months to life. My understanding is they both said life. But they both said life. Is that right? I'd have to check, but I believe that's correct. One of them was a 45 to a 43, and the other was a 43 to a 41, and life was still provided for at the upper end of the range. Yes. So life was still available. Because of the criminal history category. Right. Yes. Life was still available, and the judge said that he would impose a life sentence no matter what. Are there any further questions? Thank you. Your Honor, with respect to some rebuttal, with respect to Perez, I would first submit that the government has made an incorrect statement to you, which was followed by Your Honor with respect to preparatory acts for the attempted murder. In terms of Instruction 56, which related to the acts, it is not sufficient for a preparatory act to be part of the attempt. In other words, the buying of the rope or obtaining of the car are not sufficient to meet the test required to be part of that. Because an attempt has to be something that essentially there's no going back. Right. And obtaining the vehicle. But back up, because does that mean that if they'd actually killed him, it would have been enough because it was planned, but because it was just an attempt, you only look at the attempt? No, the charge for the... Because that doesn't seem to, what you're saying doesn't seem to be consistent with the Brown case. The position is that the acts were merely preparatory in terms of getting the vehicle and getting to do the murder. As it related to the actual attempt charge, not the conspiracy to murder. The actual attempt charge, those are not to be determined as being an act in California, even if there was a call for it. Even if A tells B, I want you to murder Macedo, and thereafter B obtains a car to transport him to Mexico and tricks the victim into the car. You're saying A cannot be convicted under an aiding and abetting theory of attempted murder? That can't be the law. That would be with respect to the conspiracy, yes, because there would be... No, I'm talking about attempted murder. If A orders B to kill someone and B thereafter carries out the order and attempts to murder somebody, wouldn't A also be responsible for attempted murder, even though all A did was order the murder in California? Yes, but that's not what happened here. And in terms of the journey of... So the other hypothetical is if we actually had an agreement in California to murder the guy, and Perez got the car to drive it to Mexico to murder him in California, would that be attempted murder? No, I submit not. It would be conspiracy to murder. That would satisfy count 16, but not count 18. Let's take conspiracy out of it. Perez decides he wants to kill him. Yes. He rents a car in California, kidnaps him in California, drives him across the border to Mexico, and then tries to kill him. Would California courts have jurisdiction in that? I submit no. I don't know how you can say that. Well, it's because of... It's the actual act of attempt. It's because of what attempt is, because attempt in order to protect against... I mean, this is a whole thing that hasn't been briefed at all, but my recollection is that it's things like, you know, somebody drives a car up to a bank intending... And, you know, with a gun in his hand, but never actually goes in. Is that attempted bank robbery? And the answer is usually no. But if he walks in and then changes his mind or walks in, but it's water, then that is attempted bank robbery. So that's the problem. It's that for other reasons, attempt is closely cabined because you don't want to discourage people from changing their mind, essentially. But that's nothing that's been briefed anywhere near in this case. Also, with respect to the... There is no sufficiency of evidence as it relates to the kidnapping... Let me ask you something. California law says the following. No one's mentioned this, and I must be missing something. But it says whenever a person who was in this state kidnaps another person within the meaning of Sections 207 and 209... I don't know if they did here. And thereafter carries the person into another state or country and commits any crime of violence or theft against that person in the other state or country, the person is punishable for that crime of violence or theft in this state in the same... Oh, it's the problem is that he was acquitted of the kidnapping? I guess that's the problem. He was convicted of the conspiracy... So therefore it can't be the kidnapping. Yes. And the conspiracy to kidnap, I'd submit that there was insufficient evidence of him conspiring to kidnap, when the only evidence of Perez in terms of that agreement was he made a phone call to get the car. That's the only evidence that ties him... Yeah, but that seems very difficult. Because what was he doing? He phoned to get the car... I think with regard to the attempted murder, you're on stronger ground as to the conspiracy, but as to the kidnapping... Well, he asked her to get the car to go... I think the question was why he'd get the car and go to Mexico. Well, he needed a car to hide him out. His intention was to go with him and take him. Rusty didn't want to go. He thought when he met, in terms of the facts when he met, he thought he was getting money. They said, no, where are we going? We're taking him to Mexico to hide out. He didn't want to go. All right. Your time is up. Thank you very much. Thank you all for your arguments in this difficult case. We're going to take a short break. Thank you.
judges: Berzon, Tallman, Nelson